IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

RaeShaun Hand,                         :
                                       :        Case No. 1:19-cv-941
        Plaintiff,                     :
                                       :        Judge Susan J. Dlott
                v.                     :
                                       :        Order Granting Amended Motion for
CSX Transportation, Inc.,              :        Partial Summary Judgment
                                       :
        Defendant.                     :


        This matter is before the Court on Defendant's Amended Motion for Partial Summary

Judgment (Doc. 29), to which Plaintiff filed a Response in Opposition (Doc. 31) and Defendant

filed a Reply (Doc. 33).  Defendant CSX Transportation, Inc. ("CSXT") seeks partial summary

judgment on the whistleblower retaliation claim brought by Plaintiff RaeShaun Hand under the

Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109.  For the reasons that follow, the

Court will **GRANT** the Amended Motion for Partial Summary Judgment.

I.      **BACKGROUND**

A.      **Factual History**[1]

        CSXT is a railroad carrier engaged in interstate commerce within the meaning of the

FRSA.  CSXT hired Hand in 2003.  He worked as a sheet metal worker in CSXT's Louisville

Division at all relevant times.  CSXT provided Hand with on-the-job training and required him to

follow written safety rules.  (Hand Dep., Doc. 24 at PageID 238.)  In 2017, CSXT suspended

Hand for fifteen days for allegedly breaking two of those safety rules after he reported that he

---

[1] The factual history is derived from CSXT's Proposed Undisputed Facts (Doc. 29-1) and Hand's Response (Doc. 31-1), except where specifically noted otherwise.

had been injured during a workplace accident.  Hand denies that he broke safety rules.  He alleges that CSXT violated the FRSA by suspending him in retaliation for reporting his injury.

### 1.     CSXT Safety Rules

As explained in more detail below, following his injury, CSXT accused Hand of violating its written Safe Way Rules related to job briefings and suspended loads.  James Turner, the company's Chief Mechanical Officer, averred that "CSXT consistently holds employees accountable for violating the Company's important safety rules."  (Doc. 22 at PageID 204.)

### a.     Safe Way Rule 2002—Job Briefings

CSXT Safe Way Rule 2002 addressed job briefings:

2002.1  Effective job briefings at the beginning of and throughout our workday make us more aware of our surroundings and better prepared to recognize and avoid potential hazards. . . .

* * *

2002.2  A job briefing must be conducted before beginning a work activity and when:

>   a.  Work activity or conditions change, or
>
>   * * *
>
>   d.  Required to secure any equipment or train . . . .
>
>   * * *

2002.3  To conduct a job briefing, employees must:

>   1.  Discuss the sequence of job steps;
>
>   2.  Identify, eliminate, contain, or communicate all potential hazards related to the task(s);
>
>   * * *
>
>   6.  Ensure understanding of the planned sequence of events; and
>
>   7.  Follow up to ensure compliance with safe work practices.

(Doc. 22-1 at PageID 205–206.)

### b.        Safe Way Rule 2405—Suspended Loads

Safe Way Rule 2405 addressed the use of hoisting equipment and suspended loads.  Rule 2405.2(c) stated that employees performing work with cranes and hoisting equipment must not "place [themselves] between a suspended load and an obstruction."  (*Id.* at PageID 207.)

### 2.        July 11, 2017 Incident

On July 11, 2017, Hand was injured on the job.  Hand was working at CSXT's Queensgate Locomotive Shop in Cincinnati, Ohio.  He and his co-worker, Steven Roberts, were assigned to remove a snowplow from the front of a locomotive engine.  Hand had removed snowplows from engines before, sometimes with Roberts.  (Doc. 32 at PageID 643.)  The snowplow was 12-feet long, 3-and-a-half-feet tall, and weighed 872 pounds.  Hand and Roberts conducted at least a limited job briefing before beginning work, but the scope of the briefing required and the briefing conducted are disputed.  Hand and Roberts discussed that Roberts would use a torch to burn off the bolts attaching the snowplow to the engine, while Hand would act as the "safety person" to make sure no one approached them.  According to Hand, they also discussed that after removing the plow Roberts would get the forklift to move the plow while Hand would get the four wooden blocks onto which Roberts would place the plow.  (Doc. 24 at PageID 257–258; Doc. 32 at PageID 643.)[2]

---

[2]  Hand knew that CSXT required him to conduct a job briefing before performing a task on the railroad.  He offered the following testimony at his deposition about when job briefings had to be performed:

> Q. So every time a new person would enter your job you would conduct a new job briefing?
> A. Yes.
> Q. Okay. Would you do job briefings for various steps of your job for the day?
> A. For each job assigned.
> Q. What does that mean?
> A. If I was assigned one job and was told to do another job with somebody else, I would job brief with that next person.
> Q. Okay. I assume some jobs have multiple steps involved, correct?
> A. Yes.

Hand admitted that he and Roberts did not discuss securing the plow to the forklift when moving it.  (Doc. 31-1 at 628.)  Hand had never secured the plow to a forklift during previous jobs.  (Doc. 24 at PageID 318.)

Hand and Roberts removed the snowplow from the locomotive engine where the engine was standing.  After Roberts torched off the bolts, the plow fell four inches to the ground.  (Doc. 24 at PageID 254.)  The next step was to move the snowplow to the side out of the way of the locomotive.  Roberts went to get a forklift.  (*Id.* at PageID 255.)  Hand did not think that Roberts was qualified to operate the forklift, but he had seen Roberts do so multiple times in the past in front of the foreman.  (*Id.* at PageID 256–257.)  When Roberts came back with the forklift, he opened up the cab door to confirm that Hand had placed the blocks for the plow.  (*Id.* at PageID 259.)  Hand continued to act as the safety person and gave Roberts directions to position the plow onto the blocks.  (*Id.* at PageID 264.)  Roberts moved the plow in a vertical, upright position.  Hand stated that after Roberts placed the plow on the blocks, still in an upright position, Roberts began to pull the forklift away from the plow without waiting for Hand's command.  (*Id.* at PageID 267.)  Hand contends that Roberts was supposed to wait for his command because he was doing a visual safety check.  (*Id.*)  Hand testified at his deposition that they otherwise had done a verbal job briefing before each step of the process.  (*Id.* at PageID

---

Q.  Would you job brief before each step?
A.  Yes.

(Doc. 24 at PageID 249–250 (emphasis added)).  He later testified a second time that he was required to have a separate, verbal job briefing for each step of a job.  (*Id.* at PageID 310.)

  Other employees were also asked how often job briefings had to be performed.  Senior Mechanical Manager Jerry Hughes testified that "[j]ob briefings can take place multiple times during a task."  (Doc. 27 at PageID 438.)  He went on to say that multiple job briefings would be needed if conditions changed, an issue arose, or someone new joined the task.  (*Id.* at PageID 439.)  Jerry "Bubba" Turner, the Terminal Superintendent, also testified that job briefings were to be held at the beginning of a job and when "outside factors" or "the work scope" changed.  (Doc. 25 at PageID 358.)  George Code, a Lead Machinist, stated that job re-briefings were required "any time the work changes, in any way, shape, or form."  (Doc. 26 at PageID 405.)

311.)  The snowplow tipped over towards the locomotive when Roberts began to reverse the forklift.  (*Id.* at PageID 271.)  Hand pushed on the plow handle to move himself away from the plow as it fell, and he injured his back and shoulder in doing so.  (*Id.* at PageID 270–272.)  Hand reported that he was injured to his supervisor, Mechanical Manager Josh Webb, who in turn notified Terminal Superintendent Jerry "Bubba" Turner.  (Doc. 32 at PageID 644.)  Approximately twenty minutes later, Webb took Hand to the hospital.

Hand was standing where the red arrow is pointing at the time of the accident:



(Doc. 32 at PageID 645.)  He testified at his deposition that he was between the yellow handle on the snowplow and the locomotive steps.  (Doc. 24 at PageID 266.)  In his later-dated Affidavit,

Hand stated that he was standing "to the outside of the plow, facing the forklift, with [his] right hand approximately in line with the grab iron on the top of the plow." (Doc. 32 at PageID 645.)

Senior Mechanical Manager Jerry Hughes testified at his deposition that the best way to store a plow was to lay it on its back. He stated that the plow would have to have been secured loosely to the forklift to be able to lay it flat. (Doc. 27 at PageID 438.) Jerry Turner testified that the safest course of action was to lay a plow flat or store it upright secured to a stationary object. (Doc. 25 at PageID 357.)

### 3.	Investigation and Discipline

CSXT's practice was to investigate all injury reports. (Doc. 24 at PageID 318.) In fact, CSXT had conducted an investigation after Hand had suffered one prior injury on the job in 2011. No disciplinary charges were filed against Hand for that incident. (*Id.* at PageID 317–318.)

Senior Mechanical Manager Hughes, Terminal Superintendent Jerry Turner, Mechanical Manager Webb, and Jason Wise investigated the July 11, 2017 incident. They inspected the area where the injury occurred and obtained witness statements. Roberts completed a statement during the investigation recalling that he and Hand "job briefed about how to remove [the] plow." (Doc. 25-5 at PageID 397.) Hand averred that during the investigation he was not asked where he was standing when the snowplow started to fall nor shown any photos in connection with the incident. (Doc. 32 at PageID 645.)

Following the investigation, CSXT issued a Preliminary Incident Report dated July 19, 2017 with the following conclusion:

> It was determined that the snow plow was to be placed onto wooden blocks to allow the plow to stand upright. The safest course of action would have been to lay the snow plow down flat or to secure it upright to a stationary object. Neither of these solutions were acted upon. The two employees attempted to place the

6

snow plow on wooden blocks with the sole means of control provided by the
forklift tines under the plow.  The load was not secured to the forklift and was
unstable.  This allowed the load to shift causing the plow to fall towards the
injured employee when it was lowered onto the wooden blocks.  The injured
employee had previously placed himself into the red zone prior to lowering the
plow onto the blocks.  As the plow struck the employee, he attempted to catch the
872 pound plow resulting in discomfort to lower back and right side.  There were
a multitude of wrong decisions made that led to this injury.

(Doc. 27-1 at PageID 472.)  The Preliminary Incident Report did not discuss whether Hand and

Roberts conducted a proper job briefing.  (*Id.* at 452–477.)

CSXT charged both Hand and Roberts with rule violations.  In a letter dated July 17,

2017, CSXT specifically charged Hand with "fail[ing] to conduct a job briefing with a fellow

employee" and "plac[ing him]self between a suspended load and an obstruction."  (Doc. 25-2 at

PageID 369.)  CSXT charged Roberts with a job briefing violation.

There is contradictory evidence as to who made the decision to charge Hand.  Terminal

Superintendent Jerry Turner testified that the decision to charge Hand was made collectively by

him, Senior Mechanical Manager Hughes, and Mechanical Manager Webb.  (Doc. 25 at PageID

352.)  However, Webb denied that he determined whether Hand had conducted a job briefing

and stated that he was not consulted on the decision as to whether Hand should face charges.

(Doc. 28 at PageID 552–554.)  Hughes, likewise, testified that Jerry Turner "was the charging

officer" and that he was not asked about bringing charges against Hand.  (Doc. 27 at PageID

443.)

Hand and Roberts were subject to CSXT's Individual Development and Personal

Accountability Policy ("IDPAP"), a progressive discipline policy.  CSXT offered Hand the

opportunity to sign a waiver and accept responsibility for the incident in exchange for agreeing

to the penalty of a formal reprimand.  Hand would not have lost pay or days of work if he

accepted the formal reprimand.  He declined to sign the waiver.  Conversely, Roberts signed the

waiver accepting responsibility and was not subject to a disciplinary proceeding.  (Hand Dep., Doc. 24 at PageID 304.)

CSXT proceeded to an investigation hearing consistent with the collective bargaining agreement to determine Hand's responsibility for the incident and to assess discipline if warranted.  The hearing was conducted on October 10, 2017 by a hearing officer, a management-level employee not involved in the investigation of the incident.  (Doc. 27-8 at PageID 516.) Hand had union representation at the hearing, and both sides presented witnesses and evidence. (*Id.* at PageID 518–519.)

Hand testified about when and to what extent he and Roberts "job briefed" the task on the day of the incident.  (*Id.* at PageID 537–540.)  He testified that they had the following discussion after removing the plow from the forklift:

> [Roberts s]aid, okay.  I'm going to go get the forklift.  I said, okay.  He says, get some blocks.  I said okay.  Blocks is right there by the door.  He seen, he's looking where the blocks are at too.

(*Id.* at PageID 537.)  He later testified that the last thing they "job briefed about" was "sitting the blocks down."  (*Id.* at PageID 539.)

After the hearing, the hearing officer determined that the rule violations charges had been "[p]roven."  (Doc. 25-3 at PageID 370.)  He specifically found that Hand and Roberts did not re-job brief about removing the plow from the forklift.  (*Id.*)

CSXT Chief Mechanical Officer James Turner then reviewed the hearing transcript and the hearing officer's findings.  He determined that Hand violated Safe Way Rule 2002.3 for failing to conduct a job briefing before transporting a snowplow and Safe Way Rule 2405.2 for placing himself between a suspended load and an obstruction.  (Doc. 22 at PageID 203.)  He concluded that "just saying one person is going to get blocks and the other is going to get a forklift" without "identification, elimination, containment or discussion of all hazards related to

the task" was not a job briefing under the rule.  (*Id.*)  James Turner issued Hand a 15-day

suspension, the level of discipline called for under the IDPAP.  He averred during this litigation

that Hand's report of an on-duty injury played no role in his decision to suspend Hand.  (*Id.* at

PageID 204.)

Hand's suspension overlapped, at least in part, with the days he was off work due the

injury he suffered during the July 11, 2017 incident.  The Union grieved the suspension.  A

Public Law Board upheld the finding of violation of the Safe Way Rules and the suspension.

(Doc. 23-1.)[3]

**B.      Procedural Posture**

On January 3, 2018, Hand filed a charge of retaliation under the FRSA, 49 U.S.C.

§ 20109, a railroad whistleblower protection provision, with the Department of Labor's

Occupational Safety and Health Administration.  (Doc. 23-2 at PageID 218–222.)  He alleged

that CSXT punished him for rule violations in retaliation for reporting his injury.  (*Id.*)  Notice of

the charge was provided to CSXT in a written letter dated January 5, 2018.  (*Id.* at PageID 223–

225.)

Hand filed his Complaint in this action against CSXT on November 6, 2019.  (Doc. 1.)

He asserted in Count 1—Violation of FRSA—that CSXT retaliated against him for reporting "an

on-the-job injury and related safety hazards, as well as violations of federal railroad safety

regulations."  (*Id.* at PageID 4.)  He asserted in Count 2—Violation of the Federal Employers'

Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*—that CSXT negligently failed to provide him

with a safe workplace.  (*Id.* at PageID 5–6.)  CSXT denied the allegations against it.  (Doc. 16.)

---

[3]  Hand objects that the findings of the hearing officers and Public Law Board are inadmissible hearsay evidence.
However, the Court presents this evidence as merely a record of the findings made, not for the truth of the findings.

Following discovery, CSXT moved for summary judgment on Count 1, the FRSA retaliation claim.  (Doc. 29.)  Hand responded that summary judgment should be denied.  (Doc. 31.)

## II.   STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant has the burden to show that no genuine issues of material fact are in dispute.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–587 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011).  The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–324 (1986).  In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  "[F]acts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also EEOC v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*) (quoting *Scott*).  A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir.

2014) ("A dispute is 'genuine' only if based on *evidence* upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted).

## III.    ANALYSIS

### A.    FRSA Overview

The purpose of the FRSA "is to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents."  49 U.S.C. § 20101.  In its whistleblower protection provision, the FRSA makes it illegal for railroad carriers to "discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done" to report a safety violation or to report a work-related personal injury.  49 U.S.C. § 20109(a).  It creates a private right of action in favor of employees, but they first must exhaust administrative remedies by filing a complaint with the Department of Labor.  49 U.S.C. § 20109(d).  The "rules and procedures" and the "legal burdens of proof" set forth in 49 U.S.C. § 42121(b), part of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, apply in any administrative proceeding brought under § 20109(d)(1).  *Id.* § 20109(d)(2)(A).

Employees can then move to federal court in one of two ways.  "[I]f the Secretary of Labor has not issued a final decision within 210 days after the filing of the complaint and if the delay is not due to the bad faith of the employee, the employee may bring an original action at law or equity for de novo review in the appropriate district court of the United States."  49 U.S.C. § 20109(d)(3).  Alternatively, if the Secretary of Labor issues an order, the employee can seek appellate review of the order in the appropriate circuit court of appeal.  *Id.* § 20109(d)(4).

CSXT asserts two primary bases for granting it summary judgment on the FRSA claim.  First, Hand failed to exhaust his administrative remedies in part.  Second, Hand was disciplined

11

for Safe Way Rules violations, not for reporting his injury. The Court agrees with both assertions and will grant summary judgment to CSXT on the FRSA claim.

**B.      Failure to Exhaust Administrative Remedies**

The Court begins with the exhaustion argument. Hand alleged in his Department of Labor retaliation charge that CSXT retaliated against him "for reporting the injury." (Doc. 23-2 at PageID 219, 222.) He did not allege to the Department of Labor that he had reported safety hazards or safety regulation violations. (*Id.*) CSXT argues that the Court should dismiss the FRSA claim to the extent that Hand alleges for the first time in Count 1 that CSXT retaliated against him for reporting safety hazards and railroad safety regulation violations. The Court agrees. Hand failed to exhaust his administrative remedies as to these allegations, and therefore, the subclaims based on the allegations fail as a matter of law. *See Foster v. BNSF Railroad Co.*, 866 F.3d 962, 967 (8th Cir. 2017) (dismissing subclaims not related to the claims raised in the administrative complaint); *see also Gibbs v. Norfolk S. Ry. Co.*, No. 3:14-CV-587-DJH-DW, 2018 WL 1542141, at *5 (W.D. Ky. Mar. 29, 2018) (considering only the subclaims based on adverse actions the plaintiff raised in the administrative complaint).

**C.      Retaliation or Rules Violation**

CSXT next asserts that it is entitled to summary judgment on the merits of the FRSA claim because it suspended Hand for violation of the Safe Way Rules, not for reporting his injury. The Sixth Circuit in 2014 set forth the following standard of law governing an FRSA action:

> The FRSA incorporates by reference the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, under which an employee must show that (1) he engaged in protected activity; (2) the employer knew that he engaged in protected activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable personnel action. *Araujo v. New Jersey Transit Rail Operations, Inc.,* 708 F.3d 152, 157 (3d Cir.

2013).  The employee bears the initial burden, and [he] must show "by a preponderance of the evidence that protected activity was a contributing factor in the adverse action alleged in the complaint."  29 C.F.R. § 1982.109(a).  The burden then shifts to the employer, who must demonstrate "by clear and convincing evidence that it would have taken the same adverse action in the absence of any protected behavior."  *Id.* § 1982.109(b).

*Consol. Rail Corp. v. U.S. Dep't of Labor*, 567 F. App'x 334, 337 (6th Cir. 2014) (§ 20109(d)(4) appeal); *see also Mangold v. Norfolk S. Ry. Co.*, No. 5:20-CV-214, 2020 WL 7334679, at *3, 6 (N.D. Ohio Dec. 14, 2020) (applying *Consolidated Rail Corporation* in a § 20109(d)(3) review), *appeal filed*, No. 21-3059 (6th Cir. Jan. 19, 2021); *Ortiz v. Grand Trunk W. R. Co.*, No. 13-13192, 2014 WL 4658762, at *5–6 (E.D. Mich. Sept. 17, 2014) (same).[4]

The Court begins with Hand's prima facie burden.  The first three prongs are undisputed. Hand reported an injury, CSXT was aware that he reported the injury because it launched an investigation into how he was injured, and CSXT took an adverse action against Hand by

---

[4]  Although neither party briefs the issue, the Court notes that there is some debate about whether to apply the § 42121(b) standards—the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century standards—in a § 20109(d)(3) "de novo review" in a district court.  In April 2020, the Sixth Circuit stated that there are "uncertainties" about whether it is correct to apply the "rules and procedures" and "burdens of proof" from § 42121(b) in § 40109(d)(3) cases.  *Lemon v. Norfolk So. Ry. Co.*, 958 F.3d 417, 419 (6th Cir. 2020).

The Sixth Circuit in *Lemon* pointed out that the statutory language in § 20109(d)(2)(A)(i) and (ii) specifically states only that the rules, procedures, and legal burdens of proof set forth in § 42121 apply to FRSA administrative proceedings before the Department of Labor under § 20109(d)(1).  *Id.*  Section 20109(d)(2)(A)(i) and (ii) do not state that the rules, procedures, and legal burdens of proof apply to district court proceedings under § 20109(d)(3). The Sixth Circuit also questioned whether the "contributing factor" causation standard in § 42121 should apply in court actions:

> Also opaque is whether "contributing factor" causation, the standard in § 42121, is one of the "rules and procedures" or "burdens of proof" incorporated into § 20109.  *Id.* § 42121(b)(2)(B)(i). A causation requirement doesn't seem to fit naturally into either category.  And applying "contributing factor" causation to § 20109(d) actions could read the causation standard for different kinds of protected activities out of § 20109(a)–(c) ("due, in whole or in part"; "for").  *Id.* § 20109(a), (c)(2).  That is odd because Congress tweaked one of those standards at the same time it added the reference to § 42121, suggesting the partial incorporation of § 42121 did not extend to substituting its causation standard for the ones in § 20109. P.L. 110–53, § 1521, 121 Stat. 266 (Aug. 3, 2007).

*Id.*  The Sixth Circuit declined to resolve the questions it raised in *Lemon,* and in doing so created uncertainty as to the standards district courts should apply in § 20109(d)(3) actions.  *Id.*  In the absence of clearer guidance from the Sixth Circuit, this Court will apply the *Consolidated Rail Corporation* standards here following the *Mangold* and *Ortiz* precedents.

suspending him for fifteen days.  *See Consol. Rail Corp*, 567 F. App'x at 337 (setting out the

prima facie case factor).  However, the parties dispute whether Hand's report of an injury

contributed to CSXT's decision to suspend him.  Under *Consolidated Rail Corporation*, Hand

initially bears the burden to prove by a preponderance of the evidence that his reporting an injury

contributed to the decision to discipline him.  *Id.*

The contributing factor standard "has been understood to mean any factor which, alone or

in connection with other factors, tends to affect in any way the outcome of the decision."

*Id.* at 338 (internal quotation and citation omitted).  This factor requires Hand to provide

evidence of retaliatory animus against him.  *See Lemon v. Norfolk So. Ry. Co.*, 958 F.3d 417, 419

(6th Cir. 2020) ("[E]ven if Lemon provided concrete, admissible evidence of a policy of

pretextual retaliation, that would not alter the reality that Lemon hasn't shown the railroad

retaliated against *him*.").  A contributing factor need not be the sole factor causing the adverse

action.  The FRSA prohibits adverse actions done "in whole or in part" in retaliation for

protected acts.  49 U.S.C. § 20109(a).  Circumstantial evidence of a contributor factor can

include:

> temporal proximity, indications of pretext, inconsistent application of an
> employee's policies, shifting explanations for an employer's actions, antagonism
> or hostility toward a complainant's protected activity, falsity of an employer's
> explanation for the adverse action taken, and change in the employer's attitude
> toward the complainant after he engages in protected activity.

*Mangold*, 2020 WL 7334679, at *8.

To begin, Hand cannot prove that his protected activity contributed to CSXT's decision

to discipline him simply because CSXT only investigated the July 11, 2017 incident after Hand

reported his injury.  The Sixth Circuit in *Lemon* rejected a chain-of-events causation theory:

> This chain-of-events theory of causation suffers from two problems:  It does too
> much, and it does too little.

> It does too much because it's hard to think of any event in a person's life that could not be viewed as a contributing factor under this theory. . . .
>
> His test does too little because it would authorize employees to engage in banned behavior so long as it occurs during protected conduct.

958 F.3d at 420.

Hand offers more than a chain-of-events theory, but ultimately the evidence does not show that the decision to *discipline* Hand for rules violations, as opposed to the decision to *charge* Hand with rules violations, was retaliatory.  First, Terminal Superintendent Jerry Turner made the decision to charge Hand and Roberts before the injury investigation was complete.  The Preliminary Incident Report is dated July 19, 2017, but CXST charged Hand with two Safe Way Rule violations in a letter dated July 17, 2017.  (Doc. 25-2 at PageID 369; Doc. 27-1 at PageID 454–455.)  Second, the Preliminary Incident Report did not address the extent of Hand's and Roberts's job briefing.  Third, Hand averred that he was not asked about job briefings nor about where he was standing when he was injured before Jerry Turner made the decision to charge him.  (Doc. 32 at PageID 644–645.)  Finally, the CSXT managers offered contradictory testimony as to who made the decision to charge Hand with the rules violations.  Jerry Turner testified that he made the decision with Hughes and Webb, but Hughes and Webb both testified that they did not make the decision.  (Doc. 25 at PageID 352; Doc. 27 at PageID 443; Doc. 28 at PageID 552–554.)  These facts together support an inference that Hand's reporting the job injury, as opposed to Hand's conduct during the incident, might have contributed to CSXT's decision to *charge* Hand with Safe Way Rule violations.

However, this does not mean that the decision to *discipline* Hand was retaliatory.  Again, Hand initially must prove by a preponderance of the evidence that his protected act was a contributing factor in CSXT's decision to discipline him, and then CSXT has the burden to prove by clear and convincing evidence that it would have disciplined Hand even if he had not reported

15

his injury.  *See Consol. Rail Corp.*, 457 F. App'x at 337.  The company suspended Hand for

fifteen days after Chief Mechanical Officer James Turner concluded following the evidentiary

disciplinary hearing that Hand violated Safe Way Rules 2002.3 and 2405.2.  Although there

might be a material dispute whether Hand actually violated the Safe Way Rules, there is

evidence from which James Turner and CSXT could conclude that he had.

The evidence establishes that Hand and Roberts conducted at least a limited job briefing,

but whether the job briefing satisfied Safe Way Rule 2002 is at issue.  Roberts said in a statement

that he and Hand had a job briefing about removing the snowplow from the engine, but he did

not address whether they had a job briefing about moving the plow or placing it safely on the

ground.  Roberts later signed a waiver accepting responsibility for the incident.  Hand testified

that a job briefing was required for each step.  He stated that they had a job briefing after the

snowplow was removed from the engine and before it was moved with the forklift, but he

described that briefing only as dividing up the task duties.  They discussed that Roberts would

operate the forklift, while Hand would get the blocks and direct Roberts to place the plow on the

blocks.  There is no evidence that Hand and Roberts discussed potential hazards or how to

eliminate them as required by Safe Way Rule 2002.3.  "To conduct a job briefing, employees

must . . . 2. Identify, eliminate, contain, or communicate all potential hazards related to the

task(s)."  (Doc. 22-1 at PageID 205–206.)  Hand and Roberts did not discuss securing the plow

to the forklift or another stationary object when it was moved.  They did not discuss how they

would place the plow on the ground or pull the forklift away from the plow.

Turning to Safe Way Rule 2405.2, employees were prohibited from "plac[ing

themselves] between a suspended load and an obstruction."  (Doc. 22-1 at PageID 207.)  The

snowplow had just been carried and placed in an upright position on the blocks by the forklift,

16

and it immediately fell over as the forklift prongs pulled away.  The photograph included in the Factual History subsection with the red arrow pointing to where Hand was standing can be viewed as indicating that Hand stood between the plow and the train engine.  Hand was injured when the snowplow fell over from its upright position towards the train engine, also suggesting that Hand was standing between the two objects.

Moreover, the critical inquiry "is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying [the discipline]."  *Gunderson v. BNSF Ry. Co.*, 850 F.3d 962, 969 (8th Cir. 2017) (citation omitted); *see also Mangold*, 2020 WL 7334679, at *9–10 (quoting from *Gunderson* and declining to review the merits of the discipline decision in favor of the "honest belief rule").  Hand has not presented any evidence or argument that James Turner did not honestly believe that he violated the Safe Way Rules.[5]  He does not show that similarly-situated workers who violated rules, but did not report injuries, were treated differently. He does not dispute that he previously reported an injury in 2011 and was not disciplined.  He does not dispute that a 15-day suspension was the appropriate remedy for the rules violations. For these reasons, the Court concludes as a matter of law that CSXT has proven by clear and convincing evidence that it would have disciplined Hand for violating the Safe Way Rules even if he had not engaged in the protected behavior.  Hand's claim that CSXT violated the FRSA by retaliating against him for reporting an injury must be dismissed.

---

[5]  Relevant here, Plaintiff appears to confuse Jerry Turner with James Turner.  He mistakenly asserts that Jerry "Bubba" Turner investigated Hand's injury, made the decision to charge him with rules violations, and concluded after the disciplinary hearing that Hand violated two Safe Way Rules. (Doc. 31 at PageID 616, 619, 622–623.)  This is incorrect.  Jerry Turner, the Terminal Superintendent, investigated the injury and made the charging decision. James Turner, the Chief Mechanical Officer, determined that Hand violated Safe Way Rules 2002.3 and 2405.2 after the disciplinary hearing and issued the suspension.  The Court cannot infer that James Turner was a biased decisionmaker because Jerry Turner might have rushed the decision to charge Hand.

**IV.     CONCLUSION**

For the foregoing reasons, Defendant's Amended Motion for Partial Summary Judgment

(Doc. 29) is **GRANTED.**  Count 1 of the Complaint is dismissed.

**IT IS SO ORDERED.**

BY THE COURT:

<u>S/Susan J. Dlott</u>
Susan J. Dlott
United States District Judge

18